omitted). In an action for trademark infringement, where famous and distinctive marks like those owned by Plaintiffs plainly merit protection, "a showing that a significant number of consumers are likely to be confused" satisfies both irreparable harm and a likelihood of success. Virgin Enters., 335 F.3d at 146 (reversing denial of preliminary injunction).

Courts do not hesitate to grant provisional relief when distinctive intellectual property assets have been studiously copied, as they have in this case. Yurman Design Inc. v. Diamonds & Time, 169 F. Supp. 2d 181, 184-86 (S.D.N.Y. 2001) (preliminary injunction against use of plaintiff's trademark in jewelry advertisement); Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., 111 F.3d 993, 997-98 (2d Cir. 1997) (preliminary injunction against toy that violated plaintiff's trade dress).[4]

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR TRADEMARK RELATED CLAIMS.

### A. There Is a Likelihood of Confusion.

A proper likelihood of confusion analysis, whether conducted under the infringement (15 U.S.C. § 1114) or false designation of origin (15 U.S.C. § 1125(a)) prongs of the Lanham Act, Virgin Enters., 335 F.3d at 146, looks at the factors set forth in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961): (1) the strength of the plaintiff's trade dress; (2) the similarity between the two dresses; (3) the competitive proximity of the parties' products in the marketplace; (4) the likelihood that the senior user will bridge the gap, if any, between the products; (5) evidence of actual confusion; (6) the defendant's bad faith; (7) the quality of the defendant's product; and (8) the sophistication of the relevant consumer group. Id.

---

[4] Courts base this relief on the trademark holder's "inability to control the nature and quality of the infringer's goods . . . not because the infringer's goods are necessarily inferior." Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc., 698 F.2d 862, 867 (7th Cir. 1983); accord El Greco Leather Prods. Co. v. Shoe World, Inc., 806 F.2d 392 (2d Cir. 1986).

In this case, however, the Court need not undertake a factor-by-factor analysis under Polaroid because counterfeits, by their very nature, cause confusion. See Gucci Am., Inc. v. Duty Free Apparel, Ltd., 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) (citing Topps Co., Inc. v. Gerrit J. Verburg Co., 41 U.S.P.Q.2d 1412, 1417 (S.D.N.Y. 1996) ("Where the marks are identical, and the goods are also identical and directly competitive, the decision can be made directly without a more formal and complete discussion of all of the Polaroid factors.")). Indeed, confusing the customer is the whole purpose of creating counterfeit goods. See In re Vuitton Et Fils S.A., 606 F.2d 1, 5 (2d Cir. 1979) (granting writ of mandamus awarding TRO because "the very purpose of the individual marketing the cheaper [and virtually identical] items is to confuse the buying public into believing it is buying the true article"); see also Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir. 1987) ("Where, as here, one produces counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product, there is a presumption of a likelihood of confusion.").

Moreover, in this case, a straightforward application of the Polaroid factors also demonstrates that the likelihood of confusion is extremely high:

1. **Plaintiffs' Marks Are Strong And Distinctive.**

It is well established that Plaintiffs' Marks are famous, distinctive, and strong. See, e.g., Gucci Am. Inc. v. Ashley Reed Trading, Inc., 00 Civ. 6041 (RCC), 2003 WL 22327162, at *9 (S.D.N.Y. Oct. 10, 2003) (determining as established facts under F.R.C.P. 56(d) that "Gucci owns the trademarks at issue" and "the trademarks are valid").[5] Most, if not all, of the registered

---

[5] See also Gucci Am., Inc. v. Action Activewear, Inc., 759 F. Supp. 1060, 1063-64 (S.D.N.Y. 1991) (finding that Gucci Marks are not only "clearly fanciful," "strong," and have "secondary meaning," but also that the association with Gucci "overshadows the characteristics of the goods themselves"); Gucci Shops, Inc. v. Dreyfoos & Assocs., Inc., Case No. 83-709-CIV-ALH, 1983 WL 425, at *1-2 (S.D. Fla. Nov. 7, 1983) (because Gucci's "extensive media advertising reaches millions of retail customers throughout the United States," the "Gucci Marks have acquired and now enjoy distinctiveness, goodwill,

Plaintiffs' Marks are arbitrary or fanciful as applied to the goods or services with which they are used. See Fourth Toro Family L.P. v. PV Bakery, Inc., 88 F. Supp. 2d 188, 195 (S.D.N.Y. 2000) ("H&H" is an arbitrary mark when used to indicate the source of bagels); see also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 871 (2d Cir. 1986) ("registered trademarks are presumed to be distinctive and should be afforded the utmost protection"). To the extent there is any question as to the inherent distinctiveness of Plaintiffs' Marks, there is no dispute that Plaintiffs' Marks have been prominently used for a long period of time, achieving widespread recognition and fame and, therefore, acquired distinctiveness. Moss Decl. ¶¶ 4-10; Henderson Decl. ¶¶ 4-10, 13-19.

### 2. The Infringing Products Are Virtually Identical To Authorized Plaintiffs' Products.

Defendants employ identical counterfeits of Plaintiffs' Marks on their Counterfeit Products; thus, this Polaroid factor favors Plaintiffs. See Rado Watch Co., Ltd. v. ABC Co., No. 92 Civ. 3657 (PKL), 1992 WL 142747, at *4 (S.D.N.Y. June 8, 1992) (granting preliminary injunction where it is "exceedingly difficult" to distinguish between authentic and infringing goods, "even in a side-by-side comparison").

Furthermore, minor differences do not matter because "the test of confusion is not whether the products can be differentiated" when compared side-by-side. Fun-Damental Too, 111 F.3d at 1004. Instead, the test is "whether they create the same general overall impression such that a consumer who has seen" the senior user's product would, "upon later seeing the [infringing product] alone, be confused." Id.; see also Paddington Corp. v. Attiki Importers & Distribs., Inc., 996 F.2d 577, 586 (2d Cir. 1993) (differences in the details of parties' products

---

and secondary meaning"); Gucci Shops, Inc. v. R.H. Macy & Co., Inc., 446 F. Supp. 838, 839 (S.D.N.Y. 1977) (Gucci name and green-red-green stripe "clearly identify the product with the plaintiff").

11

did not matter because "[e]ach label's lettering style, layout, and coloration, taken together, convey the same impression").

### 3. The Competing Products Overlap And There Is No Gap to Bridge.

The closer the defendants' goods are "to those the consumer has seen marketed under" the plaintiffs' brand, "the more likely that the consumer will mistakenly assume a common" source. Virgin Enters., 335 F.3d at 149-50. Here, because both Plaintiffs and Defendants are in "the same segment of commerce," there is "no gap" between them at all. Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 219 (2d Cir. 1999); see also GTFM, Inc. v. Solid Clothing Inc., 215 F. Supp. 2d 273, 296 (S.D.N.Y. 2002) (where both plaintiff and defendant sell jerseys, "[b]oth of these factors weigh heavily in favor of" finding a likelihood of confusion); Gucci Am., Inc. v. Action Activewear, Inc., 759 F. Supp. at 1065 ("Where, as here, the parties are selling very closely related, if not identical products, there is no gap to bridge.").

### 4. Defendants' Marks Were Designed In Bad Faith.

If there is a showing that Defendants intended to copy Plaintiffs' Marks, "likelihood of confusion will be presumed as a matter of law." The N.Y. State Soc'y of Certified Public Accountants v. Eric Louis Assocs., Inc., 79 F. Supp. 2d 331, 340 (S.D.N.Y. 1999) (citing Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 258 (2d Cir. 1987)). Here, the similarities are overwhelming. Not content with simply copying the Plaintiffs' Marks and product designs themselves, Defendants also market their Counterfeit Products with an ersatz version of the Plaintiffs' names and labels. These facts make "the conclusion that [Defendants] wanted the public to identify its merchandise with [the Plaintiffs'] trademarks…inescapable." NBA Properties, Inc. v. YMG, Inc., No. 93 C 1533, 1993 WL 462836, at *3 (N.D. Ill. Nov. 9, 1993). This showing of bad faith entitles Plaintiffs to a presumption of confusion in the marketplace. See Kraft Gen. Foods, Inc. v. Allied Old English, Inc., 831 F. Supp. 123, 132 (S.D.N.Y. 1993)

(courts may infer intent to capitalize on the plaintiff's goodwill "[w]hen a company appropriates an identical mark that is well known and has acquired a secondary meaning"); GTFM, Inc., 215 F. Supp. 2d at 297 (where similarities "are so strong that they could only have occurred through deliberate copying...a presumption arises that the copier has succeeded in causing confusion").[6]

### 5. The Quality of Defendants' Products, Although Inferior, Is Similar.

If Defendants' Counterfeit Products are inferior, this Polaroid factor weighs in favor of Plaintiffs. See Consolidated Cigar Corp. v. Monte Cristi de Tabacos, 58 F. Supp. 2d 188, 199 (S.D.N.Y. 1999); Gucci Am., Inc. v. Action Activewear, Inc., 759 F. Supp. at 1066 ("the existence of inferior infringing goods strengthens a plaintiff's 'interest in protecting its reputation from debasement'") (citation omitted). The renown of Plaintiffs' Marks is due largely to Plaintiffs' rigorous quality control standards. Moss Decl. ¶¶ 9, 19; Henderson Decl. ¶¶ 7, 9. Plaintiffs' initial inspection of Defendants' Counterfeit Products revealed, among other things, poor construction, missing care, and incorrect buttons and hangtags. See id. More importantly, however, the "actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." Polymer Tech. Corp. v. Mimran, 975 F.2d 58, 62 (2d Cir.), amended by, reported at 1992 U.S. App. LEXIS 32204 (2d Cir. 1992), aff'd, 37 F.3d 74 (2d Cir. 1994). Because Plaintiffs have no control over the quality of Defendants' Counterfeit Products, this factor further supports a finding of likelihood of confusion.

### B. Plaintiffs Are Also Likely To Succeed On Their State Law Claims.

Because so many of the Polaroid factors favor a finding of confusion, an award of preliminary relief is appropriate. See, e.g., Lexington Mgmt. Corp. v. Lexington Capital

---

[6] See also Gucci Am., Inc. v. Action Activewear, Inc., 759 F. Supp. at 1065 ("Where the evidence 'show[s] or require[s] the inference that another's name was adopted deliberately with a view to obtain some advantage from the good will, good name, and good trade which another has built up, then the inference of likelihood of confusion is readily drawn, for the very act of the adopter has indicated that he expects confusion and resultant profit.'") (citation omitted).

13

Partners, 10 F. Supp. 2d 271, 288-89 (S.D.N.Y. 1998) (issuing preliminary injunction where only five of the Polaroid factors favor a likelihood of confusion). For the same reason, Plaintiffs also have shown a likelihood of success on their trademark infringement, unfair competition and deceptive trade practices claims under New York State law. Tri-Star Pictures, Inc. v. Unger, 14 F. Supp. 2d 339, 359 n.18 (S.D.N.Y. 1998) (because "the standards for trademark infringement are essentially the same under the Lanham Act, New York law and the common law. Defendants have similarly infringed upon Plaintiffs' marks under New York law and the common law"); GTFM, Inc., 215 F. Supp. 2d at 300-02 (likelihood of success on federal infringement claims supports likelihood of success on New York infringement, unfair competition, dilution, and deceptive business practices claims).

C.  **Defendants' Activities Clearly Dilute Plaintiffs' Marks.**

Plaintiffs also meet the standard for trademark dilution established in this Circuit: "(1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark." Savin Corp. v. Savin Group, 391 F.3d 439, 448-49 (2d Cir. 2004).

Here, the first four factors are beyond dispute. Plaintiffs' Marks are undeniably famous and distinctive, and Defendants began using infringing versions of Plaintiffs' Marks in commerce long after the Plaintiffs first made them famous. Moss Decl. ¶¶ 4-6; Henderson Decl. ¶¶ 7-8; see also Gucci Am., Inc. v. Action Activewear, Inc., 759 F. Supp. at 1063-64;[7]

With respect to the fifth factor, in light of the recent Trademark Dilution Revision Act of 2006, Pub. L. No. 109-312, 120 Stat. 1730 (codified in relevant part at 15 U.S.C. § 1125(c)(1)),

---

[7] See also Gucci Shops, Inc. v. Dreyfoos & Assocs., Inc., 1983 WL 425, at *1-2; Gucci Shops, Inc. v. R.H. Macy & Co., Inc., 446 F. Supp. at 839.

Plaintiffs need only establish a "likelihood of dilution" rather than "actual dilution."[8] Plaintiffs, however, can meet their burden under either standard. Where, as here, "the junior and senior marks are identical...actual dilution can reliably be proven through circumstantial evidence." Moseley v. V Secret Catalogue, Inc., 537 U.S. 418, 434 (2003). In fact, "the closer the products are to one another, the greater the likelihood of both confusion and dilution." Nabisco, Inc., 191 F.3d at 222. Defendants sell their merchandise for the obvious purpose of offering cheaper and inferior version of Plaintiffs' Products. It is hard to imagine circumstantial evidence that would show more clearly a reduction in Plaintiffs' Marks' capacity to identify and distinguish officially licensed goods and services. See, e.g., Kraft Gen. Foods, Inc., 831 F. Supp. at 134-35 (it is "abundantly clear" that dilution, in addition to infringement, occurs when defendant uses plaintiff's marks "in the same markets and the names are similar enough to cause confusion among the purchasing public").

Moreover, New York State dilution law protects against both blurring and tarnishment, and has done so even before the Trademark Dilution Revision Act of 2006 made clear that federal law protects against both as well. Blurring occurs when the defendant "uses or modifies the plaintiffs' trademark to identify the defendant's goods...raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiffs' product." See GTFM, Inc., 215 F. Supp. 2d at 301 (New York State dilution claim established by defendant's use of plaintiff's "05" trademark on competing jerseys) (citation and internal quotation marks omitted). That is precisely what is occurring here. Similarly, tarnishment occurs when a trademark is used

---

[8] See Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 81 U.S.P.Q.2d 1064 (E.D. Va. Nov. 3, 2006) (explaining that the recent amendment to 15 U.S.C. § 1125(c) replaces the "actual dilution" requirement with a "likely dilution" requirement).

on goods of lesser quality, as also is the case here. Id.; Moss Decl. ¶¶ 19, 24; Henderson Decl. ¶¶ 18-19, 23.

### III. PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION.

As a matter of law, a showing of a likelihood of confusion is sufficient to establish irreparable harm. Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 73 (2d Cir. 1988); NBA Props. v. Untertainment Records LLC, 99 Civ. 2933 (HB), 1999 U.S. Dist. LEXIS 7780, at *17 (S.D.N.Y. May 26, 1999). Indeed, "[i]n a trademark case such as this, a substantial likelihood of confusion constitutes, in and of itself, irreparable injury sufficient to satisfy the requirements of Rule 65(b)(1)." In re Vuitton Et Fils S.A., 606 F.2d at 4.

Plaintiffs need not, however, rely solely on this presumption. If this Court does not issue an injunction, Plaintiffs will suffer very real harm in the form of unquantifiable lost sales and market share. See Moss Decl. ¶¶ 22-24; Henderson Decl. ¶¶ 22-23; see also Paco Rabanne Parfums, S.A. v. Norco Enters., Inc., 680 F.2d 891, 894 (2d Cir. 1982) ("Where there is…such high probability of confusion, injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows…[t]he likelihood of damage to reputation and good will, even where there is no proof of lost sales…[and] entitles a plaintiff to preliminary relief.") (citation omitted); Multi-Local Media Corp. v. 800 Yellow Book Inc., 813 F. Supp. 199, 202 (E.D.N.Y. 1993) ("Federal courts have long recognized the need for immediate injunctive relief in trademark infringement cases due to the amorphous nature of the damage to the trademark and the resulting difficulty in proving monetary damages."); Hogan Decl. Ex. 1 (remarks of President George W. Bush upon signing the bipartisan Stop Counterfeiting in Manufactured Goods Act, Mar. 16, 2006) ("Counterfeiting hurts businesses. They lose the right to profit from their

innovation. Counterfeiting hurts workers, because counterfeiting undercuts honest competition [and] rewards illegal competitors.").[9]

Accordingly, both by presumption of law and on the strength of the specific facts of injury shown, this Court has overwhelmingly sufficient evidence to warrant issuance of a preliminary injunction against Defendants.

IV.    **PLAINTIFFS ALSO SATISFY THE ALTERNATE STANDARD FOR A PRELIMINARY INJUNCTION.**

Plaintiffs also are entitled to a preliminary injunction under the alternate standard because they have shown that (1) serious questions exist, going to the merits of the case, and that these questions are fair ground for litigation, and (2) the balance of hardships tips in their favor. Merkos L'Inyonei Chinuch, Inc., 312 F.3d at 96; Le Sportsac, Inc. v. K Mart Corp., 754 F.2d 71, 74 (2d Cir. 1985).

As long as there is at least one issue of sufficient importance "going to the merits to create a firm ground for litigation," Plaintiffs have met their burden under the first prong of this standard. Reuters Ltd. v. United Press Int'l, 903 F.2d 904, 909 (2d Cir. 1990). Because they have shown a convincing likelihood of success on the merits, Plaintiffs, by definition, also have raised very substantial objections and questions that are fair game for litigation.

The remaining issue, the balance of hardships, tilts decidedly in favor of Plaintiffs. If no injunction is issued, Plaintiffs will suffer significant, irreparable hardship because they will have lost control over the very indicia that communicate "Gucci" and "Chloé" to millions of consumers – Plaintiffs' Marks. Moreover, countless consumers will continue to be misled by

---

[9] The time that Plaintiffs have spent investigating Defendants and pursuing other counterfeiters is no impediment to a finding of irreparable harm. A trademark owner need only fight one trademark battle at a time, and delay is no defense where, as here, Defendants' conduct was calculated to trade on Plaintiffs' reputation, and they could easily forgo their enjoined conduct. See Cuban Cigar Brands N.V. v. Upmann Int'l, Inc., 457 F. Supp. 1090, 1097-99 (S.D.N.Y. 1978) (Weinfeld, J.), aff'd, 607 F.2d 995 (2d Cir. 1979); Transfer Print Foils, Inc. v. Transfer Print of Am., Inc., 720 F. Supp. 425, 440-41 (D.N.J. 1989).

Defendants' conduct and no later action by this Court could retrieve that lost good will. <u>See</u>, <u>e.g.</u>, <u>id.</u> ("irreparable harm discussed earlier" meets plaintiff's burden under the balance of hardships); Stop Counterfeiting in Manufactured Goods Act, Pub. L. No. 109-181, 120 Stat 285 (codified in scattered sections of 18 U.S.C.) (Congressional finding that "ongoing counterfeiting of manufactured goods poses a widespread threat to public health and safety"); Hogan Decl. Ex. 1 ("[C]ounterfeiting hurts consumers, as fake products expose our people to serious health and safety risks. Counterfeiting hurts the government. We lose out on tax revenue."). Defendants, in contrast, could easily manufacture and sell apparel products that do not infringe Plaintiffs' rights.

## V. PLAINTIFFS ARE ENTITLED TO AN ORDER RESTRAINING DEFENDANTS' TRANSFER OF ASSETS.

The damages provisions of the Lanham Act provide that if Plaintiffs succeed on the merits, as demonstrated above is likely, they "shall be entitled...to recover [among other things] defendant's profits," 15 U.S.C. § 1117(a), treble their actual damages and prejudgment interest because this is a counterfeiting case, <u>id.</u> § 1117(b), or statutory damages up to a maximum of $1,000,000 "per counterfeit mark per type of goods...sold, offered for sale, or distributed," <u>id.</u> § 1117(c). Here, because Defendants sell at least 46 different types of goods bearing counterfeits of Plaintiffs' Marks, Kuklina Decl. ¶¶ 6, 8, Plaintiffs are likely to be entitled to an award of between $23,000 (assuming the minimum statutory damages of $500 per counterfeit mark per type of goods sold) and $46 million (assuming the maximum statutory damages of $1,000,000 per counterfeit mark per type of goods sold), focusing on just one theory of damages.

Multiple circuit courts have made clear that a district court has the inherent authority pursuant to the Lanham Act to issue an order restraining a defendant's assets so that a plaintiff's right to recovery of its damages is not later rendered meaningless. <u>See</u>, <u>e.g.</u>, <u>Levi Strauss & Co.</u>

v. Sunrise Int'l Trading, Inc., 51 F.3d 982 (11th Cir. 1995); Reebok Int'l Ltd. v. Marnatech Enters., 737 F. Supp. 1515 (S.D. Cal. 1989), aff'd, 970 F.2d 552 (9th Cir. 1992); N. Face Apparel Corp. v. TC Fashions, Inc., 05 Civ. 9083 (RMB), 2006 U.S. Dist. LEXIS 14226, at *11 (S.D.N.Y. Mar. 30, 2006). This is consistent with long-standing practices in the Second Circuit, which provide that "[t]he framing of an injunctive decree responsive to the particular facts in a trademark infringement and unfair competition suit is ordinarily within the domain of the trial court," and that "every means of preventing continuance of deceptive practices is proper." Levitt Corp. v. Levitt, 593 F.2d 463, 469, n.10 (2d Cir. 1979) (citations omitted); Am. Safety Table Co. v. Schreiber, 287 F.2d 417, 419-20 (2d Cir. 1961).[10]

In Reebok International Ltd. v. Marnatech Enterprises, the district court concluded that the asset restraint was appropriate based on plaintiff's showing of: (1) a "reasonable likelihood" that "defendants engaged in a substantial business of counterfeit goods"; (2) immediate and irreparable harm as a result of defendants' counterfeiting activities; and (3) that defendants might hide their illegal ill-gotten funds if their assets were not frozen. 737 F. Supp. at 1527. The Ninth Circuit, in affirming this decision, implied that it might be an abuse of discretion for a court to fail to award equitable relief such as an asset freeze "if such an action were necessary to protect a plaintiff's right to recovery of § 1117 profits and damages and to ensure that a defendant may not benefit by willfully engaging in illegal trademark activity." 970 F.2d at 558-59.[11]

---

[10] See also Quantum Corporate Funding, Ltd. v. Assist You Home Health Care Servs. of Va., L.L.C., 144 F. Supp. 2d 241, 250 n.9 (S.D.N.Y. 2001) ("where plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains its equitable power to freeze assets") (emphasis in original).

[11] See also Republic of Philippines v. Marcos, 862 F.2d 1355, 1364 (9th Cir. 1988) (en banc) ("[a] court has the power to issue a preliminary injunction to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies"); Mason Tenders Dist. Council Pension Fund v. Messera, No. 95 Civ. 9341 (RWS), 1997 WL 223077, at *7 (S.D.N.Y. May 7, 1997) (acknowledging that "[a]lmost all the Circuit Courts [including the Second Circuit] have held that Rule 65 is available to freeze assets pendente lite under some set of circumstances").

As set forth above, Plaintiffs have shown that they are likely to succeed on the merits of their claims, and that they will suffer irreparable injury from Defendants' sale of Counterfeit Products. Defendants are also likely to hide their assets. Defendants trade in counterfeit goods; thus, unlike a legitimate business that may be subject to accounting and tax requirements and that has readily identifiable assets that may be used to satisfy judgments against it, there is no reason to conclude that Defendants will make their assets available for recovery or will adhere to the authority of this Court any more than they have adhered to federal and state trademark law. See Kuklina Decl. ¶¶ 42-43; Joint Statement, 130 Cong. Rec. H 12,080 (1984) ("[M]any of those who deal in counterfeits make it a practice to destroy or transfer counterfeit merchandise when a day in court is on the horizon."). The most likely reasonable inference is that Defendants will move quickly to remove monies subject to an equitable accounting to locations and accounts which neither Plaintiffs nor this Court will ever discover. See, e.g., In re Vuitton Et Fils S.A., 606 F.2d at 5 (directing district court to issue an ex parte T.R.O. in a trademark infringement case where notice would enable defendant to dispose of evidence and would "render fruitless further prosecution of the action"). Just last month, this Court granted Plaintiffs Gucci and Chloe's request for an order restraining the defendants' transfer of assets in a trademark infringement action based on substantially similar facts. See Hogan Decl. Ex. 2 (Temporary Restraining Order in Gucci America, Inc. v. MyReplicaHandbag.com, 07 Civ. 2438 (JGK) (S.D.N.Y. Mar. 27, 2007)). Similarly, an asset restraining order limiting the transfer of Defendants' assets is critical here to maintain the status quo and preserve Plaintiffs' right to an equitable accounting. See Tommy Hilfiger Licensing, Inc. v. Tee's Ave., Inc., 924 F. Supp. 17 (S.D.N.Y. 1996) (finding sufficient basis for issuance of ex parte order existed where notice would have allowed the trademark infringers to destroy or hide the counterfeiting evidence);

20

Vuitton v. White, 945 F.2d 569, 575 (3d Cir. 1991) (reversing denial of ex parte seizure order where plaintiff "was likely to succeed in showing that defendants were using a counterfeit mark").

## VI.    PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY.

District courts have broad power to permit expedited discovery allowing Plaintiffs to take early depositions and to require early document production in appropriate cases. See Fed. R. Civ. P. 30(b) & 34(b). Expedited discovery may be granted when the party seeking it demonstrates: (1) irreparable injury; (2) some likelihood of success on the merits; (3) some connection between expedited discovery and the avoidance of irreparable injury; and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that defendant will suffer if expedited relief is granted. See Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs. Ltd., No. 94 Civ. 5620 (JFK), 1994 WL 719696, at *3 (S.D.N.Y. Dec. 28, 1994); Twentieth Century Fox Film Corp. v. Mow Trading Corp., 749 F. Supp. 473, 475 (S.D.N.Y. 1990).

Plaintiffs are being irreparably harmed by Defendants' manufacture, importation, offering for sale, and sale of the Counterfeit Products. Plaintiffs, therefore, need to ascertain the scope of Defendants' activities, Defendants' sources of the Counterfeit Products, any pending advertisements, offerings, sales, or shipments of Counterfeit Products, other unauthorized use of Plaintiffs' Marks, and the location of Defendants' ill-gotten profits without delay. Moreover, in order to prevent Defendants from hiding the profits of their counterfeiting, Plaintiffs respectfully request that the Court also order expedited discovery from the banks, credit card companies, and other financial institutions with evidence of these unlawful transactions. Only armed with that information can Plaintiffs gain a full and accurate picture of Defendants' infringing activities and

ensure the complete cessation of the counterfeiting of Plaintiffs' Marks and Plaintiffs' Products by Defendants and Defendants' associates.

Plaintiffs are unaware of any reason that Defendants or their banks, credit card processors, or other financial institutions would not be able to comply with these requests without undue burden. The discovery requested on a expedited basis in Plaintiffs' proposed temporary restraining order has been precisely defined and carefully limited to include only what is essential for the preliminary injunction. See, e.g., Hogan Decl. Ex. 2 (TRO entered in Gucci America, Inc. v. MyReplicaHandbag.com). More importantly, as stated in the supporting declarations and supra, Defendants have engaged in numerous deceptive practices that indicate Plaintiffs may lose the opportunity for meaningful discovery about the requested relief. Accordingly, the request for expedited discovery should be granted.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant an order temporarily restraining Defendants from selling their Counterfeit Products or any unauthorized use of Plaintiffs' Marks, an order to show cause for preliminary injunction, and an order for expedited discovery.

Dated: New York, New York
       June 11, 2007

                    Respectfully submitted,

                    GIBSON, DUNN & CRUTCHER, LLP

                    By: _____
                    Robert Weigel (RW 0163)
                    Howard S. Hogan (HH 7995)
                    200 Park Avenue
                    New York, New York 10166
                    (212) 351-4000

                    *Attorneys for Plaintiffs Gucci America, Inc.*
                    *and Chloé SAS*